**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| MICHA PURIFOY, on behalf of herself and others similarly situated, | Case No. |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| v. | |
| PEACHTREE HOTEL GROUP II, LLC d/b/a PEACHTREE GROUP, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Micha Purifoy ("Plaintiff"), by and through undersigned counsel, on behalf of herself and all others similarly situated ("Class Members"), alleges the following Class Action Complaint (the "Action") against Defendant Peachtree Hotel Group II, LLC ("Defendant") upon personal knowledge as to herself and her own actions, and upon information and belief, including the investigation of counsel, as follows:

## INTRODUCTION

1. This class action arises out of the recent targeted ransomware attack and data breach ("Data Breach") on Defendant's network that resulted in unauthorized access to highly sensitive data. As a result of the Data Breach, Class

1

Members suffered ascertainable losses in the form of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack, emotional distress, and the present risk of imminent harm caused by the compromise of their sensitive personal information.

2.      Defendant is a Georgia-based investment firm with over $2.4 billion in acquisitions, $10.6 billion in credit/lending transactions, and $2.1 billion in development investments in its portfolio which involves clients and properties located across dozens of states.[1]  Defendant also provides investment services, including asset management, construction project management, and hotel management services. [2]

3.      As such, Defendant stores a litany of highly sensitive information. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach.

4.      As explained in detail herein, on or around April 30, 2026, it was discovered that notorious cybercriminal gang "Payoutsking" executed a cyberattack against Defendant after the group posted on its dark web site that it

---

[1] https://www.peachtreegroup.com (last visited May 5, 2026); *see also* https://www.peachtreegroup.com/portfolio (last visited May 5, 2026).
[2] *Id.*

exfiltrated 698GB of personally identifiable information ("PII") from Defendant on February 19, 2026. [3]

5.    The threat actor Payoutsking threatened, "The full leak will be published soon, unless a company representative contacts us via the channels provided."[4]

6.    Unlike traditional cyber threats, Payoutsking ransomware is managed by highly organized criminal groups that employ powerful encryption to render data inaccessible except through a unique key held by the attackers.[5] Payoutsking targets organizations across various industries.

7.    Upon information and belief, the specific information compromised in the Data Breach includes, but is not limited to, PII such as names, Social Security numbers, contact information, and other information.

8.    Upon information and belief, up to and through the Data Breach, Defendant obtained the PII of Plaintiff and Class Members and stored that PII,

---

[3]https://www.ransomware.live/id/UGVhY2h0cmVlIEdyb3VwQHBheW91dH NraW5n (last visited May 5, 2026); *see also* https://www.dexpose.io/payoutsking-targets-peachtree-group-in-ransomware-attack/ (last visited May 5, 2026).

[4] https://www.dexpose.io/payoutsking-targets-peachtree-group-in-ransomware-attack/ (last visited May 5, 2026).

[5] https://digitalrecovery.com/en/decrypt-ransomware/payoutsking/#:~:text=PayoutsKING%20ransomware%20represent s%20a%20sophisticated,additional%20pressure%20tactic%20on%20victims. (last visited May 5, 2026).

3

unencrypted, in an Internet-accessible environment on Defendant's network, from which unauthorized actors used an extraction tool to retrieve sensitive PII belonging to Plaintiff and Class Members.

9.   It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to Plaintiff's and Class Members' PII.

10.   Defendant maintained the PII in a negligent and/or reckless manner. In particular, the PII was maintained on Defendant's computer system and network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

11.   In addition, upon information and belief, Defendant and its employees failed to properly monitor the computer network, IT systems, and integrated service that housed Plaintiff's and Class Members' PII.

12.   Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the PII that Defendant collected and

4

maintained is now in the hands of malicious cybercriminals. The risks to Plaintiff and Class Members will remain for their respective lifetimes.

13.    Defendant further failed to provide timely, accurate and adequate notice to Plaintiff and Class Members. Plaintiff's and Class Members' knowledge about the PII Defendant lost, as well as precisely what type of information was unencrypted and in the possession of unknown third parties, was unreasonably delayed by Defendant's failure to warn impacted persons immediately upon learning of the Data Breach.

14.    Armed with the PII accessed in the Data Breach, data thieves can commit a variety of crimes including opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to target other phishing and hacking intrusions, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15.    As a result of the Data Breach, Plaintiff and Class Members have been exposed to a present, heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now closely monitor their financial accounts to guard against identity theft for the rest of their lives.

16.     Plaintiff and Class Members may also incur out-of-pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17.     Upon information and belief, Plaintiff's PII is available on the dark web as a result of the Data Breach.

18.     By her Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed during the Data Breach including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate, long term credit monitoring services funded by Defendant, and declaratory relief.

## PARTIES

19.     Plaintiff is an individual citizen of Mobile, Alabama, where she intends to remain. Upon information and belief, Plaintiff is a Data Breach victim.

20.     Defendant is a Georgia limited liability company with its principal place of business located at 3500 Lenox Road, Suite 625, Atlanta, Georgia 30326.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 putative

class members, and at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, namely, Plaintiff, who is a citizen of Alabama. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

22. This Court has personal jurisdiction over Defendant. Defendant is registered to do business in Georgia and maintains a registered office address in Georgia at 3500 Lenox Road, Suite 625, Atlanta, Georgia 30326, and Defendant conducts a significant amount of business in Georgia.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant has registered to do business in the State of Georgia, resides in this District, maintains a registered office in this District, and a substantial part of the events giving rise to this action occurred in this District.

## BACKGROUND FACTS

### A. Defendant's Businesses

24. Defendant is a Georgia-based investment firm with over $2.4 billion in acquisitions, $10.6 billion in credit/lending transactions, and $2.1 billion in development investments in its portfolio which involves clients and properties located across dozens of states.[6] Defendant also provides investment services,

---

[6] https://www.peachtreegroup.com (last visited May 5, 2026); *see also* https://www.peachtreegroup.com/portfolio (last visited May 5, 2026).

including asset management, construction project management, and hotel management services. [7]

25.    In order to provide its services, Defendant requires, acquires, and maintains the PII of current and former clients and employees, including but not limited to their names, Social Security numbers, contact information, and other information.

26.    Plaintiff and Class Members directly or indirectly entrusted Defendant with sensitive and confidential PII, which includes information that is static, does not change, and can be used to commit myriad financial crimes.

27.    Because of the highly sensitive and personal nature of the information Defendant acquires, stores, and has access to, Defendant, upon information and belief, promised to, among other things: keep PII private; comply with industry standards related to data security and PII; inform individuals of their legal duties and comply with all federal and state laws protecting PII; and provide adequate notice to impacted individuals if their PII is disclosed without authorization, including through its privacy policy disclosures. [8]

---

[7] *Id.*

[8] [8] *See* https://www.peachtreegroup.com/privacy-policy ("We have adequate organizational and technical processes and procedures in place to protect your personal information… We aim to protect your personal information through a system of organizational and technical security measures. We have implemented appropriate and reasonable technical and organizational security measures

28.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from unauthorized disclosure.

29.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

30.     Plaintiff and the Class Members relied on Defendant to implement and follow adequate data security policies and protocols, to keep their PII confidential and securely maintained, to use such PII solely for business purposes, and to prevent the unauthorized disclosures of the PII.

**B.     Defendant Fails to Safeguard PII**

31.     On or around April 30, 2026, it was discovered that notorious cybercriminal gang "Payoutsking" executed a cyberattack against Defendant after the group posted on its dark web site that it exfiltrated 698GB of PII from Defendant on February 19, 2026. [9]

---

designed to protect the security of any personal information we process.") (last visited May 5, 2026).

[9]https://www.ransomware.live/id/UGVhY2h0cmVlIEdyb3VwQHBheW91dH NraW5n (last visited May 5, 2026); *see also* https://www.dexpose.io/payoutsking-targets-peachtree-group-in-ransomware-attack/ (last visited May 5, 2026).

32.     Payoutsking's dark web blog post stated as follows: [10]



33.     Worryingly, the dark web post already had 5,940 page views shortly after posting. [11]

34.     Additionally, the threat actor Payoutsking threatened, "The full leak will be published soon, unless a company representative contacts us via the channels provided." [12]

---

[10]https://www.ransomware.live/id/UGVhY2h0cmVlIEdyb3VwQHBheW91dH NraW5n (last visited May 5, 2026).

[11] *Id.*

[12] https://www.dexpose.io/payoutsking-targets-peachtree-group-in-ransomware-attack/ (last visited May 5, 2026).

35.    Unlike traditional cyber threats, Payoutsking ransomware is managed by highly organized criminal groups that employ powerful encryption to render data inaccessible except through a unique key held by the attackers.[13] Payoutsking targets organizations across various industries.

36.    It is likely the Data Breach was targeted at Defendant due to its status as a large financial company that collects, creates, and maintains sensitive PII.

37.    Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Defendant's custody and control. And upon information and belief, the putative class is over one hundred members — as it includes its current and former clients and employees.

38.    Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data of specific individuals, including (among other things) the PII of Plaintiff and the Class Members.

39.    Upon information and belief, and based on Defendant's Notice, Plaintiff's PII was stolen in the Data Breach. Plaintiff further believes that her PII was likely subsequently sold on the dark web following the Data Breach, as that is

---

[13] https://digitalrecovery.com/en/decrypt-ransomware/payoutsking/#:~:text=PayoutsKING%20ransomware%20represents%20a%20sophisticated,additional%20pressure%20tactic%20on%20victims. (last visited May 5, 2026).

the *modus operandi* of cybercriminals like Payoutsking. Indeed, Payoutsking has already issued a public threat to publish the PII. [14]

40.     Defendant had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from involuntary disclosure to third parties.

41.     Defendant had obligations created by contract, industry standards, common law, and its own promises and representations made to Plaintiff and Class Members to keep their PII confidential and to protect them from unauthorized access and disclosure.

42.     Plaintiff and the Class Members reasonably relied (directly or indirectly) on Defendant's sophistication and representations to keep their sensitive PII confidential; to maintain proper system security; to use this information for business purposes only; and to make only authorized disclosures of their PII.

43.     Plaintiff's and Class Members' unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions, and due to the utter failure to protect Class Members' PII. Criminal hackers obtained their PII because of its value in exploiting and stealing the identities of

---

[14] https://www.dexpose.io/payoutsking-targets-peachtree-group-in-ransomware-attack/ (last visited May 5, 2026).

Plaintiff and Class Members. The risks to Plaintiff and Class Members will remain for their respective lifetimes.

44.     Defendant has done little to remedy the harms caused by its Data Breach.

**C.     The Dark Web**

45.     Worryingly, the cybercriminals that obtained Plaintiff's and Class Members' PII appear to be the notorious cybercriminal group "Payoutsking."[15]

46.     As the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[16]

47.     Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by Payoutsking on the dark web.

---

[15]https://www.ransomware.live/id/UGVhY2h0cmVlIEdyb3VwQHBheW91dH NraW5n (last visited May 5, 2026); *see also* https://www.dexpose.io/payoutsking-targets-peachtree-group-in-ransomware-attack/ (last visited May 5, 2026).

[16] [16] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back. (last visited May 5, 2026)

**D.      The Value of Personal Identifiable Information**

48.      PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[17]

49.      Criminals can also purchase access to entire companies' data breaches from $900 to $4,500.[18]

50.      Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you

---

[17] [17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited May 5, 2026).

[18]   [18]   *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited May 5, 2026).

never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[19]

51. Attempting to change or cancel a stolen Social Security number is difficult if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

52. Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[20]

53. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable

---

[19] [19] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 5, 2026).

[20] [20]   Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft   (last visited May 5, 2026).

information and Social Security Numbers are worth more than 10x on the black market."[21]

54.    PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number.  This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[22]

55.    Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

56.    The PII compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

---

[21] [21]  Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Network World (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 5, 2026).

[22] [22]  *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1 (last visited May 5, 2026).

57.    Victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

58.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the victims of its Data Breach.

**E.    The Data Breach was a Foreseeable Risk and Defendant was on Notice**

59.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of PII preceding the date of the breach.

60.    In light of recent high profile data breaches at other industry leading companies, including T-Mobile USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), and NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the electronic records and PII it maintained would be targeted by cybercriminals and ransomware attack groups.

61.    Defendant knew or should have known that these attacks were common and foreseeable.

62.    In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year. [23] In 2024, financial services companies like Defendant were the most targeted companies in all measured industries. [24]

63.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "*[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies*. They breach networks, use specialized tools to maximize damage, *leak corporate information on dark web portals*, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[25]

64.    In February 2021, the United States Cybersecurity and Infrastructure Security Agency advised that *"[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data* if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[26]

---

[23] 2024 Data Breach Report 6, Identity Theft Res. Ctr. (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[24] *Id.*
[25] 25 ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), *available at* https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited May 5, 2026).
[26] 26 U.S. CISA, CISA Launches Campaign to Reduce the Risk of Ransomware, *available at* https://www.cisa.gov/news-events/news/cisa-launches-campaign-reduce-risk-ransomware (last visited May 5, 2026).

65.     Data breaches are preventable.[27] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[28] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[29]

66.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program.  Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

---

[27] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[28]*Id.* at 17.

[29]*Id.* at 28.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[30]

67.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities

---

[30] *Id.* at 3-4.

- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[31]

68.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and website's application flow. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    failing to adequately protect PII;

c.    failing to properly monitor its own data security systems for existing intrusions;

---

[31] [31] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020),                    *available*                    *at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited May 5, 2026).

d.  failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e.  failing to ensure the confidentiality and integrity of electronic PII it created, received, maintained, and/or transmitted;

f.  failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights;

g.  failing to implement policies and procedures to prevent, detect, contain, and correct security violations;

h.  failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports;

i.  failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PII;

j.  failing to train all members of its workforce effectively on the policies and procedures regarding PII;

k.  failing to render the electronic PII it maintained unusable, unreadable, or indecipherable to unauthorized individuals;

23

l.      failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

m.     failing to adhere to industry standards for cybersecurity as discussed above; and

n.      otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' PII.

69.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

**F.     Defendant Fails to Comply with FTC Guidelines**

70.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

71.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security

problems.[32] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[33]

72.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

73.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[32] [32] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 5, 2026).
[33] *Id*.

74.　These FTC enforcement actions include actions against financial institutions like Defendant.

75.　Defendant failed to properly implement basic data security practices.

76.　Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

77.　Defendant was at all times fully aware of its obligation to protect the PII. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**G.　Consumers Prioritize Data Security**

78.　In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[34] Therein, Cisco reported the following:

>　a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than

---

[34] [34] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited May 5, 2026).

26

75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[35]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[36]

c. 89% of consumers stated that "I care about data privacy."[37]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[38]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[39]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[40]

## H.    Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft

79.    Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These

---

[35] *Id.* at 3.

[36] *Id.*

[37] *Id.* at 9.

[38] *Id.*

[39] *Id.*

[40] *Id.* at 11.

damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

    a.  loss of the opportunity to control how their PII is used;

    b.  diminution in the value of their PII;

    c.  compromise and continuing publication of their PII;

    d.  out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

    e.  lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

    f.  delay in receipt of tax refund monies;

    g.  unauthorized use of their stolen PII; and

    h.  continued risk to their PII—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the PII.

80.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000 depending on the type of information obtained.

81.     The value of Plaintiff's and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

82.     It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

83.     One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

84.     The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

85.     In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to

29

Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

## I.    Defendant Fails to Comply with Industry Standards

86.    As shown above, experts studying cyber security routinely identify financial institutions as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

87.    Several best practices have been identified that at a minimum should be implemented by financial institutions like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

88.    Other best cybersecurity practices that are standard in the financial industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

89.     Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

90.     These foregoing frameworks are existing and applicable industry standards in the financial industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the data breach.

**J.      Plaintiff's and Class Members' Damages**

*Plaintiff's Experience*

91.     Plaintiff is a former employee of Defendant. Plaintiff provided her information to Defendant as a condition of becoming an employee of Defendant. Thus, Defendant obtained and maintained Plaintiff's PII.

92.     Plaintiff is very careful about sharing her sensitive PII. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

31

93.     Plaintiff stores any documents containing her sensitive PII in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

94.     Plaintiff provided her PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

95.     On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

96.     Since the Data Breach occurred, Plaintiff has experienced a significant uptick in spam calls, messages, and emails. Because of the timing of this increase in spam and the Data Breach, Plaintiff believes that the uptick is a result of cybercriminals having acquired her PII in Defendant's Data Breach.

97.     Based on the foregoing and on the information she provided to Defendant, Plaintiff has reason to believe that her PII including, but not limited to, her name, Social Security number, contact information, and other information were compromised in this Data Breach.

98.     As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach after receiving notice of the Data Breach,

32

including but not limited to researching the Data Breach, reviewing credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud.

99.    Plaintiff has spent significant time and will continue to spend valuable hours for the remainder of her life, that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

100.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of her privacy rights; (c) the theft of her PII; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

101.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

102.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. In addition, Plaintiff will continue to be at

present, imminent, and continued increased risk of identity theft and fraud for the remainder of her life.

## CLASS ACTION ALLEGATIONS

103. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class").

104. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the "Class").**

105. Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

106. Plaintiff reserves the right to amend or modify the Class definitions as this case progresses.

107. Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. Upon information and belief, thousands of individuals had their PII compromised in this data breach. The identities of Class

34

Members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

108. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. if Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. if Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. if Defendant owed a duty to Class Members to safeguard their PII;

f. if Defendant breached its duty to Class Members to safeguard their PII;

g.    if Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.    if Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

i.    if Defendant's conduct was negligent;

j.    if Defendant's breach implied contracts with Plaintiff and Class Members;

k.    if Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon it by Plaintiff and Class Members;

l.    if Defendant failed to provide notice of the Data Breach in a timely manner; and

m.    if Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

109.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

110.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

36

111. <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all of Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

112. <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

113. Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

114. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    if Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

    b.    if Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

    c.    if Defendant's failure to institute adequate protective security measures amounted to negligence;

    d.    if Defendant failed to take commercially reasonable steps to safeguard PII; and

    e.    if adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

115. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

116. Plaintiff repeats and re-alleges paragraphs 1 through 115 of this Complaint and incorporates them by reference herein.

117. Plaintiff and the Class (or their third-party agents) entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

118. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

119. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

120. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff's and Class Members' PII.

121. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

      a. exercise reasonable care in handling and using the PII in its care and custody;

      b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized access;

      c. promptly detect attempts at unauthorized access;

      d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

122. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an

40

increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

123.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

124.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

125.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendant with their confidential PII, a necessary part of obtaining services or employment from Defendant.

126.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

127.    PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members, and the importance of exercising reasonable care in handling it.

128.    Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

129.    Defendant breached these duties as evidenced by the Data Breach.

130.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

      a. disclosing and providing access to this information to third parties and

      b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

131.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

42

132. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

133. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

134. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

135. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

136. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and

were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
**(On behalf of the Plaintiff and the Class)**

137.    Plaintiff repeats and re-alleges paragraphs 1 through 115 of this Complaint and incorporates them by reference herein.

138.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

139.    Defendant breached its duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

140.    Defendant's failure to comply with the FTC Act, applicable laws, and regulations constitutes negligence *per se.*

141.    The injuries to Plaintiff and Class Members resulting from the Data Breach were directly and indirectly caused by Defendant's violation of the statutes described herein.

142.    Plaintiff and Class Members were within the class of persons the FTC Act intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statutes were intended to guard against.

44

143.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

144.    The injuries and harms suffered by Plaintiff and Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

145.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Breach of Implied Contract
### (On behalf of the Plaintiff and the Class)

146.    Plaintiff repeats and re-alleges paragraphs 1 through 115 of this Complaint and incorporates them by reference herein.

147.    Plaintiff and the Class entrusted their PII to Defendant as a condition of receiving Defendant's services or employment from Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such

information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

148. At the time Defendant acquired the PII of Plaintiff and the Class, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the PII and not take unjustified risks when storing the PII, including as reflected in its privacy policy disclosures.

149. Implicit in the agreements between Plaintiff and Class Members and Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

150. Plaintiff and the Class would not have entrusted their PII to Defendant had they known that Defendant would make the PII internet-accessible, not encrypt sensitive data elements, and not delete the PII that Defendant no longer had a reasonable need to maintain it.

151. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

152.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide timely and accurate notice to them that personal information was compromised as a result of the Data Breach.

153.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

154.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages to be determined at trial.

## FOURTH CAUSE OF ACTION
### Invasion of Privacy
### (On behalf of the Plaintiff and the Class)

155.    Plaintiff repeats and re-alleges paragraphs 1 through 115 of this Complaint and incorporates them by reference herein.

156.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

157.    Defendant owed a duty to Plaintiff and Class Members to keep their PII confidential.

158.    The unauthorized disclosure and/or acquisition (*i.e.,* theft) by a third party of Plaintiff's and Class Members' PII is highly offensive to a reasonable person.

159.    Defendant's reckless and negligent failure to protect Plaintiff's and Class Members' PII constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

160.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

48

161. Defendant knowingly did not notify Plaintiff and Class Members in a timely fashion about the Data Breach.

162. Because Defendant failed to properly safeguard Plaintiff's and Class Members' PII, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

163. As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiff and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

164. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII is still maintained by Defendant with their inadequate cybersecurity system and policies.

165. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiff and the Class.

166. Plaintiff, on behalf of herself and Class Members, seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' PII.

167.    Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## FIFTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

168.    Plaintiff repeats and re-alleges paragraphs 1 through 115 of this Complaint and incorporates them by reference herein.

169.    In providing their PII, directly or indirectly, to Defendant, Plaintiff and Class Members justifiably placed a special confidence in Defendant to act in good faith and with due regard to the interests of Plaintiff and Class Members to safeguard and keep confidential that PII.

170.    Defendant accepted the special confidence Plaintiff and Class Members placed in it, as evidenced by its assertion that it is committed to protecting the privacy of Plaintiff's and Class Members' personal information as detailed in its privacy policy.

171.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' PII, Defendant became a fiduciary by its undertaking and

50

guardianship of the PII, to act primarily for the benefit of Plaintiff and Class Members, for the safeguarding of Plaintiff's and Class Members' PII.

172.   Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with Plaintiff and Class Members, in particular, to keep secure their PII.

173.   Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to protect the integrity of the systems containing Plaintiff's and Class Members' PII.

174.   Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PII.

175.   As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

176.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

177.    Plaintiff repeats and re-alleges paragraphs 1 through 115 of this Complaint and incorporates them by reference herein.

178.    This claim is pleaded in the alternative to the breach of implied contract claim.

179.    Plaintiff and Class Members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendant benefitted from using their PII in the course of its business.

180.    Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

181.    Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

182.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

183.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

184.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class Members' PII because Defendant failed to adequately protect their PII.

185.    Plaintiff and Class Members have no adequate remedy at law.

186.    Defendant should be compelled to disgorge into a common fund— for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## SEVENTH CAUSE OF ACTION
### BREACH OF CONFIDENCE
**(On Behalf of Plaintiff and the Class)**

187.    Plaintiff repeats and re-alleges paragraphs 1 through 115 of this Complaint and incorporates them by reference herein.

188.    At all times during Plaintiff's and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' PII that Plaintiff and Class Members entrusted to Defendant.

189.    As alleged herein and above, Defendant's relationship with Plaintiff and the Class was governed by terms and expectations that Plaintiff's and the Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

190.    Plaintiff and the Class entrusted Defendant with their PII with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized third parties.

191.    Plaintiff and the Class also entrusted Defendant with their PII with the explicit and implicit understandings that Defendant would take precautions to protect that PII from unauthorized disclosure.

192.    Defendant voluntarily received Plaintiff's and Class Members' PII in confidence with the understanding that their PII would not be disclosed or disseminated to the public or any unauthorized third parties.

193.    As a result of Defendant's failure to prevent and avoid the Data Breach from occurring, Plaintiff's and Class Members' PII was disclosed and

misappropriated to unauthorized third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

194. As a direct and proximate cause of Defendant's actions and omissions, Plaintiff and the Class have suffered damages.

195. But for Defendant's disclosure of Plaintiff's and Class Members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' PII as well as the resulting damages.

196. The injury and harm Plaintiff and the Class suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff's and Class Members' PII. Defendant knew or should have known its methods of accepting and securing Plaintiff's and Class Members' PII were inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiff's and Class Members' PII.

197. As a direct and proximate result of Defendant's breach of its confidence with Plaintiff and the Class, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the

prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of individuals; and (viii) present and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

198. As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and the Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## EIGHTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiff and the Class)

199.    Plaintiff repeats and re-alleges paragraphs 1 through 115 of this Complaint and incorporates them by reference herein.

200.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

201.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

202.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

    b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

57

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to protect the data entrusted to it; and

d. Defendant's breaches of its duties caused—and continue to cause—injuries to Plaintiff and Class Members.

203. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

204. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

205. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damage and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff's and Class Members' injuries.

206. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

207. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.  For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C.  For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order;

  i.  prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

  ii.  requiring Defendant to protect, including through encryption, all data collected through the course of its

59

business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi. prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii.      requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.      requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.      requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.      requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

xi.      requiring Defendant to conduct regular database scanning and securing checks;

61

xii.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves; and

xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to

63

report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment and post-judgment interest on all amounts awarded;

G. Granting Plaintiff and the Class leave to amend this Complaint to conform to the evidence produced at trial; and

H. Such other and further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands that this matter be tried before a jury.

Dated: May 5, 2026                    Respectfully Submitted

By: */s/ Casondra Turner*
Casondra Turner (GA Bar No. 418426)
**MILBERG, PLLC**
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
Tel: (771) 772-3086
cturner@milberg.com

Leanna A. Loginov (*pro hac vice forthcoming*)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
lloginov@shamisgentile.com

*Attorneys for Plaintiff and the Proposed Class*